Good afternoon, your honors. I would like to touch upon three areas that we briefed. One is the recusal or the foreclosure by the government to argue that the sentence was correct. Secondly, the apprendi argument and the reasonableness of the argument. Counsel, can you pull the mic a little closer to you? Yes, is this better? Thank you. Is this better? Yes. Thank you. Yes, beginning with the recusal argument, I believe this is obviously just basic contracts. The government entered into a plea agreement with Mr. Garza, indicated by its language, which is found at page 28 of our excerpts of records filed under seal, that it felt that the 20 The 26 offense level was the appropriate level in his particular circumstance. That would carry a sentencing range between 47 and 78 months. And further the language in paragraph 17 of that, at that page in the plea agreement, it indicates, quote, defendant and the USAO agree that the appropriate disposition of this case is that the court impose a sentence of five years' imprisonment as required by 18. What authority do you have for the fact that the lawyers get to tell the judge what to do? No, I'm not suggesting that. You can make recommendations, but you're not saying that the judge had to do what you said, right? No, I'm not suggesting that at all. What I'm suggesting is that the government had entered into an agreement with Mr. Garza. The terms of that agreement have not been waived. Certainly the judge has his discretion to So did the judge ask for different, did the AUSA that was there make a recommendation other than five years? No, at the time of sentencing he did not. So what you're saying is that then they shouldn't defend the sentence of the judge after that. Is that what you're saying? That's correct because of the further What's your authority for that? language in the plea agreement that indicates on appeal we agree, on appeal and collateral review, that the court's sentencing guidelines calculations are not air, although each party agrees, including the defendant and the government, to maintain on appeal its view that the calculations in paragraph 14 are consistent with the facts of this case. So this is the appeal, and the language in that portion of paragraph 18, which is 18C, is basically talking out of both sides of one's mouth. No, they're not, they're saying the judge wasn't wrong, they're just, the judge didn't do what they said. So they have to respond to the, you know, what you bring up on appeal. Well, if the, on appeal it indicates that they would only indicate that the guidelines calculated by the court was not air, but that their calculation was correct. So one is diabolically the opposite of the other. As the sentencing judge indicated at the, during the colloquy, at the change of plea, he asked Mr. Garza, do you understand the provisions of the plea agreement? It's very important so that the parties understand what the obligations are of each other. Well, let me ask you, you also raise, you say that there's an apprendee issue, but your client was sentenced to 144 months. The Ninth Circuit has repeatedly held that defendant cannot obtain relief under apprendee when the sentence does not exceed the statutory maximum authorized by the jury verdict. You've got U.S. v. SAIA, a Ninth Circuit case. What's your authority for that proposition that there's apprendee error? Our authority is actually apprendee that indicates that if the defendant is exposed to a greater sentence than the statutory maximum. And in this particular case, according to the advisory guideline calculation by the court, it arrived at an offense level of 39. An offense level of 39 carries a range of 262 months to 323, I believe it is, which is a statutory maximum and a statutory minimum greater than, I mean, excuse me, a guideline maximum and a guideline minimum. The statutory maximum, 240 months there? That's correct. Okay, and he got 144. That's correct, but his exposure was greater than the 144 months that he did receive, based on the arguments that we have presented. And although the guideline range, as Brody indicated, must be looked at under apprendee as the starting point, the starting point used by the court was the greater guideline range of an offense level of 39. Granted that there was an adjustment down to a guideline range of 36, the actual guideline should have been a maximum of 240. The acceptability or the acceptance of responsibility is not to the, I should rephrase this, the offense level of 36, which was the product of a three-point reduction or adjustment by the court for acceptance of responsibility, is not the important number to look at. The sentencing guideline 3E1.1, which controls the granting of the three-points adjustment, indicates that the offense level is to be determined immediately before the application of the two points in subsection A of 3E1.1. So according to the guidelines, because this was not done, the exposure was greater than the 240 months. That's our argument. Sotomayor, is there ultimately a disagreement about the calculation of the guidelines here? Yes, Your Honor. As to? Yes. And we have discussed this under our argument of the unreasonableness of the sentence. Both the government and the defense attorney indicated on behalf of Mr. Garza that their calculation of the guidelines at level 26 was based on their review of the facts, review of his specific circumstances, and they felt for that reason that the statutory minimum of 5 years would be the appropriate sentence. They indicated that this conclusion was based on the fact that they felt this was not a guideline. I understand that. That isn't what I asked you. Was that what I asked you? That's what I thought. No. I asked you whether there was a disagreement about the calculation of the guidelines. At the sentencing hearing, there was not a disagreement. Okay. That's what I thought. All right. So as to this notion that the – did the judge then apply a different guideline level? Pardon me, Your Honor? Is that the same guideline level that the judge applied? The guideline that the judge applied was a level 36. Right. He reduced the level 39 by three points, by two points, under subsection A of 3E1.1. And because the government made a motion, there was the additional point under subsection B. Okay. So down to the offense level of 36. So with respect to whether the – what I was trying to figure out, and I thought that was the case, but I thought you were saying otherwise, the – so the government did not, in fact, argue for a different guideline range. It's not now arguing for a different guideline range than the one that it originally agreed to. The government isn't arguing anything other than to justify the actions of the district court. Which were not based on a different guideline range, but on his determination how to apply that. No, that's correct, because neither side at the sentencing hearing actually objected to the guideline range calculated by the probation department and adopted by the court. However, we do – We're about out of time. If you want some time, you can – We do think, just to basically indicate that, we believe that the courts did not properly implement the 3553. It indicated that, well, I can't get back to five – down to five years. I keep – he kept going back to the guidelines until it was a mandatory guideline. He did indicate that the lifetime supervised release would be appropriate because the probation officer told him, we recommend this in all of these cases. Therefore, he did not look at the specific circumstances relevant to Mr. Garza's case. Mr. Garza was a first-time offender. He had no physical contact with any victim. He had only ten images on the computer. And he is not considered a risk or, based on the conditions of probation, he would not be determined a risk to minors. Thank you very much. Good morning again, Your Honors. Mark Yohalam on behalf of the United States. I want to very quickly just deal with the Apprendi and Splee issues. I don't think they take a lot of time. Your Honor, you identified the case law that forecloses the Apprendi argument. But on top of that, even on its own terms, it fails because 5G1.1a of the sentencing manual dictates that the statutory maximum becomes the high end of the guideline. Therefore, it is impossible under the guidelines to ever have exposure beyond the statutory maximum. With respect to the plea, again, I think the Court has basically fleshed this out, that there is language in the plea agreement permitting the parties to defend what the district court did. Moreover, it's unclear to me what the remedy at this point would be, even if the Court agreed with, I think, the strange argument raised by Appellant. At this point, the arguments have all been made to the Court. This Court has its own responsibility to review the district court's decision. Nor, even if a remedy had been given earlier, I'm not sure what it would mean for the U.S. Attorney's Office to recuse itself, whether we would then hire Latham and Watkins to argue it or what. So those issues, I think, don't take a lot of time. Just to turn to the substantive reasonableness and 3553a factors, Defendant received the highest sentence of any of the defendants in the cases before the Court today. And I think that is entirely appropriate. Defendant had repeated conversations with what he believed to be 11- and 12-year-old girls. In one, he told the girls that he had done a 12- to 13-year-old one. In another conversation, he said he had played doctor with a 9-year-old. In the course of these graphic conversations, he sent images of child pornography, what he thought was a young girl, in order to groom her and prepare her to have sex with him, in a meeting that he wished to have at Disneyland, Your Honors, with the girl and her underage sister, to which she would bring condoms. Your Honor, in addition to that, Defendant has argued about the appropriateness of applying certain enhancements here. That argument fails both on the law and on its own terms. And I want to start with why it fails on the law, and that is that Defendant essentially relies upon this especially vulnerable victim enhancement. But, of course, that enhancement only applies to an especially vulnerable victim. These enhancements do not apply, don't say on their language, they only apply to a specially sadomasochistic or a special use of a computer or something like that. These are not elements of the offense, these enhancement characteristics. They are one- I understand the sadomasochistic part. The computer part at this point seems to me to be tantamount to double-counting. Why not? Well, two reasons. First, on that issue, I believe Defendant has actually waived this issue. Well, that may be, but I'm just asking you in general. Yes. It doesn't, we're not seeing a lot of books of people carrying their little photos around. Well, I will say, Your Honor, this year my office prosecuted a non-computer child pornography case. And if you look at the statistics- Yes. The fact that you regard that as remarkable is certainly a suggestion that they, you have close to 100 percent overlap, but it may not be 100 percent, maybe 99 percent. It's not 99 percent, Your Honor. It's in the 90s. I agree. But I think that as long, it is not an element of the offense. So the question is whether it is so tied to the offense that you cannot impose an enhancement. Well, there I'm not exactly sure how that argument would work, because I think there is a plausible reason to think the use of a computer here in child porn cases is something worse than the old paper system. Well, I completely understand that as to distribution. I have a much harder time with regard to users. If anything, it's maybe less worse because it's so, it's something that you don't really have to work very hard to do. You don't have to go out and find distributors and send mail, you know, and arrange mailings and receive mailings and so on. Well, is this an invitation to give my reason why I think it's worse? Yes. It's your invitation. So there are a few reasons. One is that the kind of software that's used is often peer-to-peer software. And though distribution is not always charged in those cases, as we talked about earlier, in those cases even someone obtaining child pornography is distributing it by supporting this peer-to-peer network. Even aside from that. But that's not in the guideline. You could write a guideline like that, but that's not this one. That's correct, Your Honor. On top of that, the fact of the way in which computer use is done makes it much harder for the government to destroy distribution of child pornography. That is, when someone is obtaining child pornography off the Internet, it is harder for the government to shut that down than if someone is going to a swap meet and getting it there. There are not physical copies at the point of distribution that can be destroyed and permanently ended. And that has to do with distribution. But what about the possessor? But the answer is that the possession and receipt are inextricably tied to the distribution. The distribution networks are sustained both from a technological standpoint in peer-to-peer networks and a community standpoint for other forms of distribution. But the question is why is that? This is an enhancement. It's to say this is different. There is something happening here that doesn't usually – it doesn't always happen. It doesn't almost always happen. And we seem to be saying that it doesn't almost always happen. I mean, nearly always. First, Your Honor, I do not think that an enhancement has to be something that doesn't always happen. There are numerous enhancements totally separate from 2G 2.2 that come up all the time. For example, in aggravated assault, in 86 percent of the cases, there is at least a plus 3 enhancement for the amount of injury caused. In 67 percent, there is at least a plus 3 enhancement for the use of a dangerous weapon. In obstruction of – I guess, I mean, what you're trying to do with those things is say, well, if you're going to commit this crime, commit it in a less egregious way. So are we trying to encourage people to go out and mail things instead of using their computer? Yeah. Obviously, no one is trying to encourage anyone to distribute or obtain child pornography. However, to the extent that the government could say we're going to shut down one channel, absolutely the channel we would shut down is the Internet. The Internet has created – obviously, we would not shut down the Internet entirely. But with respect to child pornography, the Internet has transformed and aggravated this problem to an unimaginable degree. And this case, in fact, demonstrates that. We have defended using the Internet to groom these girls. Well, actually, this is a terrible case for my point, and it wouldn't apply to this point. Because here, he did use the Internet for something that you could only do by the Internet, essentially. And he agreed that a computer enhancement was appropriate here. So that doesn't trouble me. But I – but there are cases, in most cases, where there wasn't any use of the Internet other than to simply receive something that was floating around in the Ethernet. And that seems to be how people are getting pornography these days. It does seem that you're not really accomplishing anything. Well, again, I disagree with you on that. I suppose maybe the answer is, well, that's fine, is you're saying the actual base is not X, it's Y. And maybe there's no problem with that, but that's really what you're doing. My view is that it is less pernicious to obtain child pornography physically. And maybe even nobody does it. Some people still do. And as long as somebody still does, it is perfectly reasonable for the commission to draw a distinction between the two. And as you allude, they could do that by upping the base by two levels and then having a two-level reduction for non-computer. Or they could do it as they want. Well, that may be the ultimate answer. And I mean, I suspect that maybe this case is so egregious, I don't even need to go through these arguments. But just to feel that, you know, because they have presented this unreasonableness argument, I do want to say, you know, they're challenging the applicability of the S&M enhancement here. First of all, they agreed to the calculation below. And second, even on their own terms, this case presents horrendous facts for the S&M enhancement. You have a prepubescent girl in a video file or an image file called, She is 8, being vaginally raped by an adult man. Now, under the Reardon decision, that is sadomasochistic. It is sadomasochistic in a way that's worse than, for example, just a girl being tied up or spanked or something. The pain and degradation involved in that act is horrendous. In terms of the application of the prepubescent factor, here there is a video of a girl in diapers, pulling down the diapers and spreading her genitals. I mean, these are horrendous, horrendous facts. You know, maybe someday a case will come to this Court that presents the question of whether these enhancements are inappropriate. It is not this case, and it is, frankly, not any of the five cases here today. For that reason, the defendant ultimately got a significantly below guidelines sentence, 44 months below guidelines. It is impossible to say that that was an unreasonably high sentence here. With that, the government is up. Thank you very much. If you have a few seconds, I'll give you a minute. Okay, thank you, counsel. The case of United States v. Garza is submitted. And we will go to the last case of a very long day, United States v. Dewitt.
judges: Fletcher B. , Berzon, Callahan